UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACCESS BUSINESS GROUP INTERNATIONAL, LLC, et al.,<br><br>                                              Plaintiffs,<br><br>     -against-<br><br>REFRESCO BEVERAGES US INC.,<br><br>                                              Defendant. | 21-cv-10779 (AS)<br><br>MEMORANDUM OPINION<br>AND ORDER |

ARUN SUBRAMANIAN, United States District Judge.

## BACKGROUND

Access Business Group wanted to make sports drinks. So it enlisted Refresco's expertise. Access would design the drink, and Refresco would manufacture it. Their Original Agreement divided the responsibilities accordingly: Access would set the "Specifications," such as the drink's formula and "[p]ackaging testing and specification development," while Refresco would manufacture the drinks to "conform to the Specifications and industry standards." Dkt. 84-1 at 9, 28. Those standards included, among others, that the drinks be "merchantable." *Id.* at 9. If the goods were "nonconforming for any reason," Refresco would be responsible for dealing with the nonconforming goods. *Id.* at 8 § 6(b), (d).

As the project progressed, Refresco worried that the drinks' electrolyte levels would corrode Access's chosen can and can liner. *See, e.g.*, Hagedorn Dep. 255:23–256:6; Moir Dep. 40:9–16. In other words, the drinks were so salty that Refresco thought Access should use a plastic bottle or higher-grade can liner. *Id.*

Given its concerns, Refresco proposed (and Access signed) the First Letter Agreement. Dkt. 84-6. Under that Agreement, Refresco had no liability for any corrosion-related problems "caused directly by the Formulas" and "to the extent due to the Formulas." *Id.* at 2. But it clarified that "nothing in this letter releases or modifies Refresco's obligations and liabilities for problems unrelated to corrosion for the Designated Products due to the Formulas." *Id.* at 2.

This Agreement expired once "corrosion testing has been completed for the Formulas for the Designated Products and such testing has shown that there is [*sic*] no corrosion problems with the Formulas." *Id.* at 3. The parties dispute whether such testing was completed or revealed any corrosion problems. In any event, Access went ahead with production, ordering more than ten million cans in various flavors. Waddell Dep. 195:21–196:22.

A few months into production, Access and Refresco executed the Second Letter Agreement. Dkt. 84-8. This Agreement was similar to the First: It said that "Refresco shall have no liability whatsoever for any damages due to the use of the Formulas in any iterations of the Designated

Products or for corrosion problems caused directly by the Formulas" and that Refresco would not be "liable for any damages … to the extent due to the Formulas." *Id.* at 2. It also clarified that Refresco's other obligations remained. *Id.* at 2–3. But the Second Letter Agreement also went further. Unlike the First Agreement, the Second Letter Agreement would "remain in full force and effect as long as Refresco is producing the Designated Products for Customer," "notwithstanding any corrosion testing that has already been performed." *Id.* at 2–3.

Eventually, Refresco's fears came true. As millions of cans sat in Access's warehouses unsold, some started leaking. Waddell Dep. 195:21–196:22. And once some cans leaked on other cans, those other cans were damaged too, potentially causing them to leak. *See, e.g.*, Dkt. 84-11 at 3. Faced with this deteriorating supply, Access trashed its remaining inventory. Dkt. 84-5 at 3. It then sued Refresco for breach of contract, seeking reimbursement for both the defective goods and the cleanup costs. Compl., Dkt. 1 ¶¶ 41–49.

The parties now cross-move for summary judgment. Dkts. 80, 91. Refresco says there is no dispute that it performed under the Original Agreement and, regardless, the two Letter Agreements shield it from any corrosion-related liability. It also says the corrosion was caused by the formulas. Access says neither of the two Letter Agreements applies to this situation, and Refresco caused the corrosion by misapplying the can liners; the formulas had nothing to do with it. Because a genuine factual dispute remains over the cause of corrosion, both sides' summary-judgment motions are DENIED.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is "material" if it could "affect the outcome." *Id.* at 248. The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). When deciding cross-motions, the Court "evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* at 125 (alteration in original).

The Court previously held that New York law applies. Dkt. 62 at 4. Under New York law, a breach-of-contract claim has four elements: "(1) the existence of a contract, (2) the plaintiff's performance pursuant to the contract, (3) the defendant's breach of its contractual obligations, and (4) damages resulting from the breach." *Arnell Const. Corp. v. New York City Sch. Const. Auth.*, 144 A.D.3d 714, 715 (2016). In interpreting the contract, the Court must "give a fair and reasonable meaning to the language used." *Hughes Commc'ns India Priv. Ltd. v. The DirecTV Grp., Inc.*, 71 F.4th 141, 153 (2d Cir. 2023) (applying New York law).

2

## DISCUSSION

Both sides agree that they had a contract, so only elements 2–4 are at issue.

### I. Genuine disputes remain over whether Access substantially performed

Element 2 requires that Access itself substantially performed its side of the contract. *See Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96 (1974). Refresco says Access failed to perform "testing of the Formulas and packaging for the finished products." Dkt. 81 at 19. It points to the provision saying Access had full responsibility for "[p]ackaging testing and specification development." Dkt. 84-1 at 28. But the contract says little about what testing counts. And at least some testing was performed—Refresco itself tries to use the results against Access. *See, e.g.*, Dkt. 81 at 20. But whether those or other tests satisfied Access's obligation is disputed. *See, e.g.*, Dkt. 84-3 at 2–4, Al-Saigh Dep. 38:4–39:21; Florek Dep. 82:2–85:16. And given that the "question of substantial performance is usually one of fact," element 2 cannot be decided on summary judgment here. *Bank of N.Y. Mellon Dep. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 312 (2d Cir. 2016) (cleaned up).

### II. Genuine disputes remain over whether Refresco breached

Next, the parties dispute who is to blame for the corrosion. That question is factually disputed, and no contractual provision supplies a legal out for either side, so summary judgment is inappropriate.

#### A. The corrosion's cause is genuinely disputed

Access argues that Refresco failed to implement Access's designs. Pointing to expert testimony, it says Refresco (through subcontractors) applied the can liners unevenly, leading to weak spots and corrosion. *See, e.g.*, Shipley Dep. 112:11–119:6. Refresco responds that Access's expert has no evidence to support his conclusion and that its own expert and other evidence indicate that the corrosion was caused by the formulas' saltiness. On top of its expert testimony, Refresco points to three pieces of evidence that suggest the formula was to blame.

First, emails between Access employees noted that the corrosion's "[r]oot cause" was "likely can/formulation interaction," exacerbated by the cans "rubbing against each other during shipping" and prolonged "[w]arehouse time" due to slow sales. Dkts. 84-12, 84-5. These potential contributing factors were first identified in an investigation by BevCorp, a neutral third party. Dkt. 84-10 at 4–5.

Second, at least some lay testimony suggests that the formula was the root cause. *See, e.g.*, Poulos Dep. 160:22–161:11. Not to mention, Access was warned several times about its formulas' potential corrosion risks. *See, e.g.*, Dkt. 84-7 (can manufacturer saying "additional testing may be required" before Access could get a warranty on cans with its chosen liner); Waddell Dep. 210:4–25 (describing Access's internal reports that the formula would be highly corrosive); Moir Dep. 40:9–16 (similar).

Third, Refresco's enamel testing suggests that there was no issue with the liners. After the leaks were discovered, Refresco tested the 1,680 empty cans it had on hand. The test measured

how much electrical current passed through the cans. Just three cans let too much current through (as judged against industry standards). Dkt. 84-14; Miller Dep. 111:12–112:22. That low pass-through rate meant that 99.8% of the tested cans had sufficiently thick liners. This evidence is sufficient to dispute Access's theory that the liners were misapplied.

But it does not put the issue beyond dispute. Access criticizes the testing in several ways. It says the testing only looks for gaps, not thinness or unevenness. *See* Al-Saigh Dep. 194:22–195:14; Shipley Dep. 97:19–98:14. It's also unknown whether the sample is representative. Shipley Dep. 98:8–10. And even defects at the discovered rate, when spread out over millions of cans, might explain what happened here. Inside-out corrosion in some cans could lead to leaks onto other cans, causing outside-in corrosion, and triggering a chain reaction. *Id.* at 98:22–103:15.

The BevCorp report also reflects this basic factual uncertainty. That report was the only one conducted by an outsider, and it was indeterminate. It could not "confirm a final or full root cause analysis without further investigation." Dkt. 84-10 at 3. It recommended further investigation into both the manufacturing process and the interaction between the formula and liner. Dkt. 84-10 at 5.[1]

As for the experts, Access has moved to exclude Refresco's expert (and briefing is ongoing). But even setting his testimony aside, there is enough evidence to create triable issues of fact. Refresco, on the other hand, has *not* moved to exclude Access's expert. So its attacks go to credibility and weight, matters unfit for summary judgment. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *see also United States v. Burkich*, 2022 WL 4236243, at *6 (N.D. Ga. Sept. 14, 2022) ("[A]lleged weaknesses in [expert] opinions are matters for the jury to consider (absent a timely filed Daubert motion).").

Each side has produced enough evidence to genuinely dispute the cause of the corrosion. And that cause controls the outcome of this case: Access was in charge of the formulas while Refresco was in charge of the cans. Neither the Original Agreement nor the Letter Agreements provides a loophole.

### B. Refresco's general warranty does not shield Access for formula-caused corrosion

Access briefly argues that Refresco is responsible even if Access's own designs caused the corrosion. Access points to the provision saying it could seek reimbursement if the products were "nonconforming for any reason." Dkt. 84-1 at 8 § 6(d). Access says the products were "nonconforming" because they were not "merchantable," as Refresco had promised. Dkt. 84-1 at 9. This argument doesn't hold up.

---

[1] Finally, there is a report from a can subcontractor that, Refresco says, pins the blame on the formulas and not the liners. *See* Dkt. 84-13. Given that this report's admissibility is disputed (Access claims that it is inadmissible hearsay, Refresco responds that it fits into exceptions) and that the other evidence is enough to create a genuine factual dispute, the Court does not rely on this report here.

Access relies on the Original Agreement's general-warranty clause. That clause provides that (1) Refresco's work will conform to Access's specifications and industry standards, and (2) each product will be "merchantable, of good material and workmanship, fit for the purposes for which Access intends it and … free from defects in workmanship and materials." *Id.* at 9 § 8(a). If Access's specifications caused the leaking and a leaking product is not merchantable, Refresco could not comply with its dueling warranty obligations. To decide "which warranty is dominant," the Court would evaluate the "intention of the parties." N.Y. U.C.C. § 2-317. And "technical specifications displace … general language of description," so Access's specifications would defeat the string of boilerplate. § 2-317(a); *see also* § 2-316 n.9.

But deciding which warranty dominates is necessary only if the two cannot "reasonably … be reconciled." *Proyecfin de Venezuela, S.A. v. Banco Indus. De Venezuela, S.A.*, 760 F.2d 390, 396 (2d Cir. 1985). If they can, "a court is required to … give both effect." *Id.*; *see also* § 2-317.

Here, the warranties can be reconciled. Read in context, the general warranty is all about the quality of Refresco's manufacturing. If Refresco perfectly executed an ill-conceived design, then it fulfilled its promises. That reading is the natural one, and it is favored by the strong presumption of giving all provisions effect. So Refresco's general warranty does not make it responsible for flaws in Access's specifications.

### C. The Letter Agreements do not shield Refresco from non-formula-caused corrosion

Refresco says the Letter Agreements assign responsibility for all corrosion to Access. And the parties spend much of their summary-judgment briefing arguing over various clauses in those Agreements. But the Court need not address all those issues because Refresco's liability under the Agreements turns on the corrosion's cause. Both Letter Agreements relieve Refresco from liability only for corrosion caused by the formulas "directly" and "to the extent" the formulas caused the corrosion. Refresco was not released from non-formula-related issues. So if the corrosion was caused at least in part by misapplied liners, the Letter Agreements do not fully shield Refresco.

Refresco gestures at a reply. It suggests that even if misapplied liners are to blame, the formulas still, in some sense, "caused corrosion problems." Dkt. 98 at 15 (alterations adopted). But it's not clear whether Refresco is making this argument at all. And if it is, the argument was not made until its reply brief, so it came too late. *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2022 WL 4448621, at *10 n.6 (S.D.N.Y. Sept. 23, 2022).

In any event, the argument fails when the relevant clauses are read in context. First, consider the Agreements as a whole. The Letter Agreements begin by noting that "Refresco has no responsibility for … the formulas … or their fitness for consumption or packaging in the selected BPA-NI aluminum cans." Dkt. 84-6 at 1; Dkt. 84-8 at 1. Both Agreements also use "directly" and "to the extent" to clarify the close relationship needed between the formulas and corrosion for Access's responsibility to kick in. *Id.* Plus, the Letters take pains to note that Refresco's other "obligations" under the Original Agreement are unchanged. This language shows that the Letter Agreements were drafted against the assumption that Refresco would properly manufacture the cans with the

5

specified liner. But if the cans were flawed, then Refresco would still be responsible for the consequences of those flaws.

Second, consider the phrase "direct cause" (or, as here, "cause[] directly"). When "there are multiple [potential] causes," "[l]imiting liability to direct causes is of no help." 14 N.Y. Prac., New York Law of Torts § 8:6. Determining "what degree of remoteness will interrupt and extinguish the defendant's liability" is at best murky. *Id.* New York courts have wrestled with this issue by boiling the inquiry down to the "substantial factor test": "a common sense inquiry into whether the defendant's conduct is so significantly connected to the plaintiff's harm that defendant should bear the responsibility for the consequences." *Id.* This test also permits finding multiple "substantial" causes, which fits with these Agreements' "to the extent" language. *See id.*; *see also id.* § 8:12 (discussing concurring and intervening causes). So one or both of the can liners and the formulas could be responsible for the corrosion, to varying degrees. That question is one of fact. *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 312, 314–15 (1980).

One might object that this reading of the Letter Agreements renders them superfluous: If the Original Agreement already assigned responsibility for formula-related corrosion to Access, why have the Letters? But the Letters themselves say that they only "clarify certain details of the parties' agreement." Dkts. 84-6 at 1, 84-8 at 1. And even if this reading creates some redundancy, that is not a sufficient reason to twist the Agreements' plain language.

## CONCLUSION

At bottom, this case turns on what caused the corrosion. Under the Original Agreement, Access was responsible for designing and testing the formulas and packaging, while Refresco was responsible for properly manufacturing the product based on Access's designs. So if the formulas caused the cans to corrode, Access has no claim against Refresco. But if Refresco's manufacturing was faulty and that faultiness caused the corrosion, Access would have a claim that the products were nonconforming. Finally, because Refresco's liability under the Letter Agreements turns on the same question, they do not shield Refresco.

For these reasons, both sides' motions are DENIED. The Clerk of Court is directed to close ECF 80 and ECF 91.

SO ORDERED.

Dated: October 23, 2023
New York, New York

ARUN SUBRAMANIAN
United States District Judge